



**ENTERED**
10/22/2008

**Entered on Docket**
**June 20, 2008**

_____
**Hon. Mike K. Nakagawa**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

| | |
|---|---|
| In re: | BK-S-06-50455-MKN |
| STEPHANIE KAY PORTER, | Chapter 7 |
| Debtor. | |
| | |
| STEPHANIE KAY PORTER | Adversary No. 06-5096 |
| Plaintiff, | Date: August 10, 2007 |
| v. | Time: 10:00 a.m. |
| HINSON HAZELWOOD STUDENT LOAN PROGRAM AND SALLIE MAE SERVICING, TEXAS HIGHER EDUCATION COORDINATING BOARD, and EDUCATIONAL CREDIT MANAGEMENT CORPORATION, | |
| Defendants. | |

**MEMORANDUM DECISION ON DEFENDANTS'**
**MOTIONS FOR SUMMARY JUDGMENT**

Defendants' motions for summary judgment were heard on August 10, 2007. The appearances of counsel and parties were noted on the record. The matters were taken under submission.

1

# BACKGROUND[1]

On July 3, 2006, Stephanie Kay Porter ("Debtor" or "Plaintiff") filed a voluntary Chapter 7 bankruptcy petition accompanied by schedules of assets and liabilities. (Dkt# 1)[2]  Debtor listed on her Schedule "E" various student loans owing to the Hinson Hazelwood College Student Loan Program having a total balance of $15,486.34 and a student loan owing to Sallie Mae Servicing with a balance of $112,424.15.

On October 10, 2006, Debtor commenced the instant adversary proceeding seeking a determination that the aforementioned student loan obligations are not excepted from discharge under Section 523(a)(8).  Defendant Texas Higher Education Coordinating Board ("THECB") is an agency of the State of Texas that administers and supervises the Hinson Hazelwood Student Loan Program.

Defendant Educational Credit Management Corporation ("ECMC") is a nonprofit guaranty agency that was assigned the federally insured student loans obtained by the Debtor. Apparently, Debtor's student loans from Sallie Mae, Inc., were guaranteed by USA Funds, Inc. On February 7, 2007, a default judgment was entered against Sallie Mae Servicing. (ADkt#40)

On April 20, 2007, THECB filed its initial motion for summary judgment ("MSJ-1") against the Debtor. (ADkt#64)   The hearing on MSJ-1 was scheduled for August 2, 2007.  On May 8, 2007, Debtor filed a response to MSJ-1 ("Debtor's Response").  (ADkt# 71)

On June 7, 2007, before the scheduled hearing on MSJ-1, THECB filed a second motion for summary judgment ("MSJ-2") against the Debtor. (ADkt#88)  On June 13, 2007, ECMC filed a joinder to both motions ("ECMC Joinder"). (ADkt#94)   Under MSJ-1, Defendants seek summary judgment based on Debtor's alleged failure to timely respond to discovery.  Under

---

[1] In the text and footnotes of this Memorandum Decision, all references to "Section" shall be to the provisions of the Bankruptcy Code appearing in Title 11 of the United States Code, unless otherwise indicated.  All references to "Rule" shall be to the Federal Rules of Bankruptcy Procedure, unless otherwise indicated.  All references to "FRCP" shall be to the Federal Rules of Civil Procedure.

[2] References in this Memorandum Decision to "Dkt#" are to documents filed in the Chapter 7 case while references to "ADkt#" are to documents filed in the adversary proceeding.

1  MSJ-2, Defendants contend that the Debtor is unable to meet the elements required for a

2  hardship discharge under Section 523(a)(8).

3        On July 2, 2007, Debtor filed a "verified" response to MSJ-2 ("Debtor's Verified

4  Opposition"). (ADkt# 95)[3]  On July 12, 2007, THECB filed a reply regarding MSJ-2 ("THECB

5  Reply") (ADkt# 96) and on July 27, 2007, Debtor filed a response to that reply ("Debtor's

6  Reply"). (ADkt# 99)  Both motions were heard on August 10, 2007 and were taken under

7  submission.[4]

8  **SUMMARY JUDGMENT STANDARDS**

9        Rule 56 of the Federal Rules of Civil Procedure is applicable in adversary proceedings

10  pursuant to Rule 7056. See In re Silva, 190 B.R. 889, 891 (B.A.P. 9th Cir.1995).  Summary

11  judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions

12  on file, together with the affidavits, if any, show that there is no genuine issue as to any material

13  fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P.

14  56(c).  For summary judgment purposes, a fact is "material" if it might affect the outcome of the

15  suit under the governing substantive law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

16  248 (1985).

17        The nonmoving party cannot rest upon mere denials or allegations in pleadings, but must

18  set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of material

19  fact for trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  When a defendant moves

20  for summary judgment, its burden may be satisfied in two ways: (1) the defendant may submit

21  summary judgment evidence that demonstrates the absence of a material element of the

22  plaintiff's claim and/or (2) the defendant may show there is no evidence to support an essential

23  element of the plaintiff's claim.  477 U.S. at 325.  It is not necessary for the defendant to

24

25

26      [3] Each of the parties have submitted exhibits with their written arguments that contain
27  the Debtor's social security number or tax identification number for her former law practice.
   That information should have been redacted.

28      [4] After the summary judgment motion was heard, the adversary proceeding was
   reassigned to this Court.

3

1    introduce evidence that negates the plaintiff's claim.  477 U.S. at 323.  When the judge is the

2    ultimate trier of fact and when trial would not enhance the bankruptcy court's ability to draw

3    inferences and conclusions from undisputed facts, the court is free to draw such inferences and

4    conclusions within the context of a motion for summary judgment.  See Matter of Lanting, 198

5    B.R. 817, 821 (Bankr. N.D. Ala.1996).

6                                  **DISCUSSION**

7          MSJ-1 seeks summary judgment based on Debtor's alleged failure to respond to

8    THECB's discovery.  MSJ-2 seeks summary judgment based on Debtor's alleged failure to meet

9    the requirements for a hardship discharge under Section 523(a)(8).

10   **I.    Summary Judgment Based on Matters Deemed Admitted.**

11         THECB argues that, on March 16, 2007, it propounded various discovery requests to the

12   Debtor, including Requests for Admission.  See MSJ-1 at 2:18-22[5].  It asserts that Debtor's

13   responses were due no later than April 16, 2007.  Id. at 2:23-26.[6]  The Joint Discovery Plan filed

14   by and agreed to by the parties on January 11, 2007 ("JDP") (ADkt# 34)[7] provides that "All

15   discovery will be commenced in time to be completed by April 18, 2007."   THECB argues in

16   MSJ-1 that because Debtor's responses were not received, the matters are deemed admitted

17   under FRCP 36(a).  See MSJ-1 at 3:6-9.  Because those requests asked Debtor to admit that she

18   "has the financial ability to repay the student loans owed to [THECB]" and that "no additional

19   circumstances exist that indicate that [Debtor's] current state of affairs is likely to persist for a

20

21

22   _____

23         [5]  Citations to the written argument submitted by THECB and ECMC will refer to the
     page number and then line separated by a colon, e.g., 4:10-15 would refer to page 4, line 10 to

24   line 15 of the document.  Because the written argument submitted by the Debtor is not paginated,
     however, citation to those arguments must be by the outline used by the Debtor, e.g., § V, B, 1

25   would refer to Section V, subsection B, part 1.  In the future, Debtor should submit any written
     arguments with page and line numbers.

26

27         [6]  In MSJ-2, however, THECB asserts that "[p]ursuant to the agreed Joint Discovery Plan
     and Bankruptcy Rule 9006, Plaintiff's responses were due by April 18, 2007."  MSJ-2 at 3:4-5.

28
           [7]  A copy of the JDP is attached as Exhibit "C" to MSJ-1.

                                          4

1   significant portion of the repayment period of the student loans...", see MSJ-1 at 3:11-15[8],

2   THECB contends that Debtor's claim to a hardship discharge under Section 523(a)(8) must fail.[9]

3   See MSJ-1 at 6:22-25.

4          In spite of THECB's assertion that it served its Requests for Admissions by mail on

5   March 16, 2007, Debtor contends that she did not receive the requests by mail until April 5,

6   2007.  See Debtor's Response at § III, A, 4 and Affidavit of Stephanie Kay Porter ("Porter

7   Affidavit").[10]   In support her contention, Debtor provides as Exhibit "C" a copy of what purports

8   to be an envelope from the Attorney General of Texas that she says she did not receive until

9   April 5, 2007.  The envelope bears a certified mail stamp as well as a postmark of March 16,

10  2007[11].  Using the 30-day response deadline under FRCP 36(a), plus the three extra days

11  available under Rule 9006(f), or the discovery deadline set forth in the JDP, the responses would

12  have been due on April 18, 2007.

13         On April 9, 2007, prior to the JDP discovery deadline and the admissions deadline of

14  April 18, 2007, the parties filed a joint "Stipulation and Order to Extend the Discovery

15  Deadline." ("Stipulation")(Dkt#58)   In the Stipulation, the parties listed the discovery that had

16  been propounded, including the admission requests to the Debtor from THECB.  See Stipulation

17  at 3:4-5.  The Stipulation extended the April 18, 2007 discovery deadline to May 31, 2007.  Id.

18  at 4:19-20.   It is unclear from the Stipulation whether the parties intended to extend the

19  discovery deadline solely to complete certain depositions or to respond to all of the outstanding

20

21

22         [8]  A copy of the Requests for Admissions is attached as Exhibit "A" to MSJ-1.

23         [9]  In MSJ-2, THECB contends that Debtor's responses to its admission requests were
     mailed to THECB on or about April 23, 2007, see MSJ-2 at 3:11-13, and were not received until
24   April 27, 2007, see MSJ-2 at 3:12-13, after MSJ-1 was filed.

25         [10]  Additional copies of the Porter Affidavit and attachments thereto are appended as
     Exhibits "A" through "D" to Debtor's Verified Opposition.
26

27         [11]  According to the Certificate of Service attached as Exhibit "B" to MSJ-1, the
     discovery propounded to the Debtor by THECB was served by first class mail rather than
28   certified mail, as well as by e-mail.  If it had been sent by certified mail, presumably it would not
     have been difficult to verify its delivery.  No such verification of delivery has been provided.

discovery listed in the Stipulation.  If that was the parties' intent, Debtor's responses to THECB's requests would have been timely, inasmuch as they apparently were mailed on April 23, 2007.  See MSJ-2 at 3:11-12.

In those responses, Debtor apparently denied that she has the ability to repay THECB's loans and denied that there are no additional circumstances indicating that her state of affairs are likely to persist.  See Debtor's Verified Opposition at § IV, B.[12]  THECB does not dispute that the Debtor did respond to the Requests for Admissions, although it contends that the responses were not timely.

Some courts have entered summary judgment where a party fails to respond to an admissions request and the matters are deemed admitted.  See, e.g., Karras v. Karras, 16 F.3d 245 (8th Cir. 1994)(affirming summary judgment in fraudulent transfer action based on default admissions of receipt of less than reasonably equivalent value).  Where responses are simply late, however, the better view looks to whether the respondent would be permitted to withdraw or amend the response if it had been timely.  See, e.g., In re Cook, 347 B.R. 527, 531 (Bankr. N.D.W.Va. 2006); In re Fetla's Trading Post, Inc., 2006 WL 538802 at *3 (Bankr.N.D.Ill. 2006); White Consolidated Industries, Inc. v. Waterhouse, 158 F.R.D. 429, 432 (D.Minn. 1994); In re Costarella, 104 B.R. 465, 468 (Bankr.M.D.Fla. 1989).  See also French v. United States, 416 F.2d 1149, 1152 (9th Cir. 1968).  Under FRCP 36(b), a court, on motion,  "may permit withdrawal or amendment [of an admission] if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits."  Fed.R.Civ. P 36(b).

Whether the parties intended in the JDP to extend time for Debtor's responses to THECB's Requests for Admissions is unclear from the facts of this case.[13]  More importantly,

---

[12]  Curiously, neither the Debtor or THECB has included an actual copy of Debtor's response to the Request for Admissions amongst the many exhibits attached to their respective memoranda.

[13]  At the hearing, counsel for ECMC indicated that all deadlines were intended to be extended, included the previously agreed deadline for filing dispositive motions.

however, it does not appear that THECB would be prejudiced by allowing Debtor's responses to be considered. To the contrary, MSJ-2 addresses the merits of Debtor's request for relief under Section 523(a)(8) and sets forth its contentions that each element of Debtor's claim is absent.

Under these circumstances, the Court concludes that consideration of Debtor's discovery responses will not unduly prejudice THECB in presenting its defense of the case and will facilitate the presentation of the merits. Moreover, there appears to be some ambiguity in the JDP as to whether the response deadline was extended. The Court therefore will proceed to the merits of MSJ-2.[14]

## II.    Summary Judgment Based on the Elements of a Hardship Discharge.

As noted, Debtor seeks hardship discharge of the loans to both Defendants under Section 523(a)(8). In the alternative, Debtor seeks to reduce the total amount of the debt owed to the Defendants be reduced such that she is required to make monthly payment of $137.08 for a period not to exceed ten years. See Amended Complaint at ¶ 23. As another alternative, Debtor apparently seeks a discharge of accrued and future interest and payment of principal over her lifetime. Id.

Debtor admits that she owes money to both THECB and ECMC. While it is true that the amount owed to the THECB is relatively small, i.e., $16,655.09 as of June 5, 2007, see MSJ-2 at 3:20-21 and Exhibit "U"[15], the amount owing to the ECMC is substantially higher, i.e.,

---

[14]  At the hearing, Debtor orally moved to dismiss MSJ-2 on grounds that the motion was untimely under the JDP, Section 4(d) of which provides that "All potentially dispositive motions should be filed by May 18, 2007." That deadline was thirty days after the agreed close of discovery on April 18, 2007. At the hearing, counsel for ECMC indicated that the parties' subsequent Stipulation extending the discovery deadline from April 18, 2007, to May 31, 2007, was intended to extend the deadline for dispositive motions as well. This interpretation makes sense since dispositive motions ordinarily are not filed until after discovery is completed. Since MSJ-2 was filed on June 7, 2007, well within 30 days after the extended discovery deadline, the Court concludes that it was timely filed. Debtor's oral motion to dismiss MSJ-2 therefore is denied.

[15]  Exhibit "U" consists of the Affidavit of John T. Maldonado ("Maldonado Affidavit") to which is attached copies of the loan documents, a "Claim Verification Balance", and a letter dated June 5, 2007, from THECB to the Debtor ("June 5 Letter") setting forth a "Graduated or Income-Sensitive Repayment Schedule" for the Debtor's obligation.

approximately $120,810.47 as of June 11, 2007.  See ECMC Joinder at 2:6-7.   Under each loan, the Debtor also is responsible for collection costs, including attorneys' fees.  See MSJ-2 at 3:22-24 and Exhibit "U".  The actual amounts owing to the Defendants may be substantially larger after factoring in all present collection costs, including attorneys' fees.[16]  Thus, while the Debtor's income and potential change in future earnings may allow for an increase in the monthly payment to the Defendants, her ability to pay the student loans, including all additional collection costs to both THECB and ECMC is problematic.

Defendants argue that they are entitled to summary judgment because the Debtor cannot meet her burden under Section 523(a)(8).  Under Section 727(b), a debtor generally is discharged from personal liability for all debts incurred prior to the filing of the bankruptcy petition.  Under Section 523, however, certain types of debt are excepted from the discharge.  Section 523(a)(8) excepts any debt "for an educational...loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit..."

This exception from the bankruptcy discharge applies for educational loans "unless excepting such debt from discharge...will impose an undue hardship on the debtor and the debtor's dependents."   Because "undue hardship" is not defined in the Bankruptcy Code, see In re Nys, 446 F.3d 938, 943 (9th Cir. 2006), a test has been adopted in this circuit requiring the presence of three elements: (1) that the debtor cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents if forced to repay the educational loan, (2) that additional circumstances exist indicating that the debtor's state of affairs is likely to persist for a significant portion of the repayment period of the loans, and (3) that the debtor has made a good faith effort to repay the loans.  See United Student Aid Funds, Inc. v. Pena (In re Pena), 155 F.3d 1108, 1111 (9th Cir. 1998), citing In re Brunner, 831 F.2d 395,

---

[16]  The June 5 Letter left blank the amount of legal charges that would be applied to Debtor's account.  At the hearing, THECB's counsel indicated that for purposes of the summary judgment motion, such charges would be waived.  If summary judgment is denied and the case goes to trial, however, counsel indicated that legal charges would be assessed against the account.  Counsel agreed that there is no evidence in the record to establish what those charges would be but suggested that they would be reasonable and within the Debtor's ability to pay.

396 (2nd Cir. 1987).  This three-factor approach is commonly referred to as the "Brunner test".
See In re Pena, supra, 155 F.3d at 1112.

    The debtor bears the burden of proof of all elements required to obtain a hardship
discharge of a student loan obligation.  See Carnduff v. United States Department of Education
(In re Carnduff), 367 B.R. 120, 127 (B.A.P. 9th Cir. 2007).   The required elements
must be established by a preponderance of the evidence.  367 B.R. at 128.   The Debtor must
satisfy all three parts of the test before her student loans can be discharged.  See Dennis Saxman
v. Educational Credit Management Corporation (In re Saxman), 325 F.3d 1168, 1173 (9th Cir.
2003).  Defendants argue that the Debtor's cause of action fails under each part of the test.

### A.  Debtor's Ability to Maintain a Minimal Standard of Living.

    THECB maintains that the Brunner test requires an examination of the Debtor's current
income and expenses to determine whether the loan would cause the Debtor's standard of living
to fall below that minimally necessary.  See MSJ-2 at 5:22-25, citing In re Birrane, 287 B.R.
490, 495 (B.A.P. 9th Cir. 2002).   How does the Court measure what is necessary to maintain a
minimal standard of living?   According to the appellate panel in Birrane, the test is whether it
would be "unconscionable" to require the debtor to take steps to earn more income or reduce her
expenses in order to make payments under a given repayment scheduled.   287 B.R. at 495,
quoting In re Nascimento, 241 B.R. 440, 445 (B.A.P. 9th Cir. 1999).  Defendants examine in
detail the Debtor's monthly income and expenses in arguing that she fails the first part of the
Brunner test.

    THECB first notes that the Debtor's income exceeds her expenses.  See MSJ-2 at 12:6-7
and Exhibits "B" and "F."   It argues that the Debtor's voluntary retirement contribution of
$202.80 per bi-weekly pay period and her medical savings account contribution of $37.99 per
pay period should be included in her available monthly income, as well as $400.00 per month in
child support, to raise Debtor's average monthly take home pay to $3,582.14.  See MSJ-2 at
11:19 to 12:10.  Deducting her claimed expenses of $2,978.00, THECB argues that the Debtor

9

1    has $604.14 available each month to pay on her student loans. Id. at 12:12-13.[17]

2           ECMC argues that the Debtor also received a federal income tax refund for the 2006 tax

3    year in the amount of $3,208.00. See ECMC Joinder at 2:14-17 and Exhibit "B" thereto. It

4    argues that dividing a similar refund over a twelve-month period in 2007, the Debtor would have

5    an additional $267.33 per month available to make loan payments. Id. at 2:17-19.

6           In response, Debtor admits that she is supposed to receive $400.00 from her ex-husband

7    each month in child support, but states that the child support payments are irregular. See

8    Debtor's Verified Opposition at § VII, C, 2. Debtor also indicates that she claims her daughter,

9    Grace Lau, on her tax returns during even-numbered years, while her ex-husband will claim their

10   daughter as a dependent in 2007 and succeeding odd-numbered years. Id. Thus, she essentially

11   argues that a tax refund in 2007 and subsequent odd-numbered tax years is not certain and

12   cannot be guaranteed. Debtor further indicates that the cash from her 2006 tax refund was used

13   to fund professional development and household expenses. See Debtor's Verified Opposition at

14   § VII, C, 1. Based on the Debtor's verified representations, a genuine dispute exists as to

15   whether Debtor's monthly income should be calculated to include child support and any tax

16   refund amounts.

17          Debtor's estimated average monthly expenses are set forth in Paragraph 20 of the

18   Amended Complaint. In her responses to THECB's interrogatories dated April 23, 2007, Debtor

19   lists her average monthly expenses at $2,978. See MSJ-2 at 12:15-25 and Exhibit "B" thereto.

20   Defendants argue that the Debtor's monthly expenses are excessive and/or unnecessary. See

21   MSJ-2 at 12:25 to 17:10; ECMC Joinder at 3:18 to 4:2.

22   _____

23          [17] ECMC argues that the Debtor has a total of at least $532.36 in excess funds available
     each month to make her student loan payments, which amount was derived by taking ECMC's
24   figure for the Debtor's monthly income of $3,510.36 minus $2,978.00 (monthly expenses
     identified by the Debtor). See ECMC Joinder at 3:12-17. ECMC's monthly income figure
25   assumes, like THECB, that the Debtor is receiving $400.00 in child support each month and
     $267.33 on average each month from a tax refund equivalent to that received by the Debtor in
26   2006. At the hearing, counsel for ECMC argued that an additional $263.64 could be added to
     Debtor's monthly take home pay if her voluntary retirement contribution were disallowed,
27   resulting in total monthly income of $3,774.00. The $263.64 figure mentioned at the hearing is
     slightly less than the amount set forth in ECMC's written argument.
28

1       Defendants argue that the Debtor's monthly rent of $920.00 is too high and that there are

2 less expensive apartments available.  See MSJ-2 at 15:20 to 16:5 and Exhibit's "Q" and "R".[18]

3 Debtor is single but apparently has legal custody of her daughter.  She states that when she

4 moved to Nevada for her current job at the Bureau of Land Management, she left her relatives in

5 San Antonio or Houston, Texas, see Debtor's Reply at § I, G, 3, and she apparently has no

6 family in Sparks, Nevada.  Debtor currently resides in a two-bedroom, two-bath apartment with

7 an apartment-size laundry unit.  See Debtor's Verified Opposition at § VII, F, 1.  Debtor claims

8 that before moving into her current apartment at the "Willow Creek" complex, she reviewed the

9 zip codes in the area to determine the safest neighborhoods.  Id.  She alleges that the majority of

10 apartments listed in THECB's Exhibits "Q" and "R" are located in a different zip code, and that

11 many of those areas include registered sex offenders whose victims were children 13 years old

12 and younger.  Id. at § VII, F, 2, (a) and Exhibit "O" thereto.  She also asserts that the only

13 comparably priced apartment complex listed on THECB's Exhibits "Q" and "R" did not have a

14 unit available when she moved to Sparks in June 2006.  Id. at § VII, F, 2, (b).  Debtor explains

15 that when she first moved into her current apartment, the rent was $835.00 per month.  Shortly

16 thereafter, however, the apartments were converted to condominiums.  As a result, her rent

17 increased to $920.00 per month.  Id. at § VII, F, 1.  Debtor asserts that her laundry expenses

18 were at least $100.00 a month when she was living in an apartment without self-service laundry.

19 Id. at § VII, F, 2, (b).  Thus, the Debtor argues that apartments having lower monthly rental rates

20 but no laundry units would require her to incur greater costs to use off-site laundry facilities.  Id.

21

22

23

24       [18]  Exhibit "Q" is an Affidavit of Nikki Gonzalez wherein she attests that on May 14,

25 2007, she performed an internet search of apartment rental properties in Sparks, Nevada, and has attached copies of the "computer screens" from three different websites.  Exhibit "R" is an

26 additional Affidavit of Nikki Gonzalez wherein she attests that on May 16, 2007, she performed an internet search of another website of available apartments in the Sparks area and also printed

27 out a map showing the distance from the Debtor's current apartment to another apartment known

28 as Stonegate Apartments.  No objection as to the admissibility of the attachments was raised by the Debtor.

THECB dismisses all of these concerns as "red herrings", <u>see</u> THECB Reply at 4:17-24[19], but offers no probative evidence that these expenses are unreasonable or any authority that these expenses should not be considered.

ECMC argues that Debtor's monthly food expense in the amount of $543.00, which includes meals outside of the home, is excessive based upon "...the official U.S.D.A. Food Plans Guidelines." ECMC Joinder at 3:18 to 4:2 and Exhibit "C" thereto. ECMC argues that under the U.S.D.A. Food Plans Guidelines for a family of two the total monthly cost of food is $320.80 under the "Thrifty Plan", resulting in an excessive food expenditure of $222.20 per month. <u>Id.</u> ECMC argues that the "Thrifty Plan" is in accordance with the "minimal standard of living" prong of the Brunner test, <u>see id.</u> at 3:23 to 4:1, but provides no authority supporting its conclusion.[20] Perhaps this is because a similar argument has been rejected under Section 523(a)(8) with respect to the Internal Revenue Service's National Standards for allowable living expenses. <u>See Educational Credit Management Corp. v. Howe (In re Howe)</u>, 319 B.R. 886, 892-93 (B.A.P. 9th Cir. 2005)(IRS standards for allowable living standards may be considered but are not determinative of student loan debtor's expenses). <u>See also</u> <u>In re Mandighomi</u>, 242 Fed.Appx 401, 2007 WL 1663676 (9th Cir. 2007)(IRS standards are not the "...sole measure of what is necessary to maintain a minimal standard of living.").[21]

Debtor argues that the $543.00 figure includes $333.00 a month for groceries and an

---

[19] Oddly, THECB's response to Debtor's concern over choosing an apartment that is safe for her minor daughter is to note that, according to a Nevada website, there are "eighteen sex offenders [who] live in Plaintiff's current zip code." <u>See</u> THECB Reply at 4 n.2. Without more, the purpose of providing such troubling information, even if it is admissible, is unclear. Is it intended to show a lack of sincerity? A lack of good sense? Or that the Debtor should move to a better neighborhood?

[20] To be more accurate, ECMC generally cites Brunner after making this argument, but nowhere in Brunner does the circuit court discuss the U.S.D.A. food plan guidelines as setting a threshold for the minimal standard of living. Nor were those guidelines discussed in the underlying appellate decision by the district court. <u>See</u> <u>In re Brunner</u>, 46 B.R. 752 , 757 & n.5 (S.D.N.Y.1985).

[21] At the hearing, the Debtor argued that the U.S.D.A. food plan guidelines apply to individuals whose incomes otherwise qualify them for food stamps and other government benefits that are unavailable to her.

additional $100.00 a month for non-food items, such as toiletries, cosmetics, paper products, and the like.  See Debtor's Verified Opposition at § VII, G, 1.   The figure also includes "meals outside the home" in the total amount of $110.00.  See Debtor's Response to THECB Interrogatory No. 13 attached as Exhibit "B" to MSJ-2.   No evidence has been presented at this juncture as to how much a single, professional parent working outside of the home should be expected to incur for food expenses.  Differences in expenditures by a professional may be considered in determining a debtor's minimal standard of living.  See In re Howe, supra, 319 B.R. at 893.   A genuine dispute therefore exists as to the reasonableness of the expenditure.

THECB argues that the Debtor's monthly daycare expense of $585.00 is excessive.  See MSJ-2 at 16:17-24.   It argues that the Debtor's daycare expense should decrease significantly when her daughter enters the first grade in the 2008-2009 school year.  Id. and Exhibit "J" thereto.  Debtor contends that between August 2007 and August 2008, her daycare expenses will increase to $650.00 per month.  See Debtor's Verified Opposition at § VII, G, 2.  She states that she contacted "the Washoe county school district, and the school for which she is zoned, does not provide full day kindergarten."  Id.  Thus, Debtor maintains that she will still have a monthly expense for a half-day of daycare after her daughter starts kindergarten.  Id.[22]  A genuine issue exists as to whether she will need daycare services and how much it will cost.

Both Defendants argue that the Debtor should not be permitted to make voluntary contributions for retirement and medical savings.  THECB argues that the Debtor "...should not be permitted to set aside savings for retirement while at the same time seeking to be excused from her student loan debts."  See MSJ-2 at 11:6-14, citing In re Peel, 240 B.R. 387, 392-93

--------

[22]  Debtor also argues that she intends to have more children before the age of 45, see Debtor's Verified Opposition at § VII, G, 2, thereby increasing her monthly day-care expenses in the future.  While there is no prohibition on a debtor increasing the number of her dependents, it is not a circumstance that presently exists and is not considered in the instant determination. More importantly, a debtor's expressed desire to voluntarily take on substantial additional financial responsibilities, while simultaneously decrying present and future circumstances, strongly militates against a favorable conclusion on the second and third prongs of the Brunner test.  Debtors  who make such choices are in no position to claim that their hardship is undue. See In re Nys, supra, 446 F.3d at 946 ("...the debtor cannot purposely choose to live a lifestyle that prevents her from repaying her student loans.").

1    (Bankr.C.D.Cal.1999) and In re Savage, 311 B.R. 835, 842-43 (1st Cir.B.A.P. 2004)[23].  Neither

2    of the cases cited, however, holds that voluntary retirement contributions are unreasonable per

3    se.       The court in Peel did not find that a debtor could not contribute to a retirement plan in

4    seeking a discharge of a student loan.  240 B.R. at 393.  Instead, the court stated that it "...would

5    not favor a rule that debtors attempting to discharge debts alleged to be unduly burdensome may

6    never put any money aside for retirement." 240 B.R. at 392-93.  Instead, the Peel court observed

7    that  "Nearly everyone should save some money for old age and retirement.  The Court is of the

8    view that the line of cases allowing judicial discretion to permit some contribution is the better

9    reasoned." 240 B.R. at 393.   Similarly, the court in Savage observed that IRA contributions

10   should be carefully analyzed, as with other expenses considered, in the totality of pertinent

11   circumstances under each debtor's particular situation.  311 B.R. at 843.  "The result may well

12   differ with changes in a debtor's age, accumulated savings, proximity to retirement, and earnings

13   and expenses forecast." Id.

14           The question is what amount, if any, should the Debtor be allowed to save for retirement

15   each  month?  Because of their position that a debtor should not be allowed to voluntarily set

16   aside any amount for retirement, Defendants have not provided the Court with any calculations

17   as to the amount that the Debtor should be allowed to save.

18           Both Defendants argue that the Debtor's voluntary retirement contributions are excessive

19   because she already receives contributions to her retirement from her employer.   THECB

20   argues, and Debtor does not dispute, that her employer contributes a total of $247.45 per pay

21   period and also matches, in part, the Debtor's voluntary deduction with an additional $81.12

22   each pay period.  See MSJ-2 at 8:20 to 9:19 and Exhibit "F".[24]  At the hearing, counsel for both

23   Defendants argued that the Debtor therefore receives over $494.00 per month in retirement

---

25

26           [23] ECMC apparently adopts THECB's argument as to the retirement and medical
     savings, but does not believe it is essential.  See ECMC Joinder at 3:10-17.

27           [24] Exhibit "F" is a copy of Debtor's "Earnings and Leave Statement" for the pay period
28   ending March 31, 2007, which sets forth the government benefits paid for that pay period as well
     as the cumulative total for the year.

1    contributions from her employer over and above her voluntary contributions.

2         THECB asserts that Debtor's voluntary deductions for retirement total $202.80 per pay

3    period. See MSJ-2 at 11:14-20. It argues that elimination of Debtor's voluntary retirement

4    contribution would increase her after-tax take home pay by approximately $156.51 per pay

5    period. Id. at 11:22 to 12:4.[25] THECB further argues that the Debtor contributes $37.99 per pay

6    period into a medical savings account. Id.[26] It alleges that the Debtor has over $12,000 in

7    retirement savings and another $1,000 in a savings account. Id. at 11:1-4. In view of her

8    employer contributions, her existing savings, her remaining working years, and her health,

9    THECB argues that it is inappropriate for the Debtor to set aside additional funds for retirement

10   while refusing to repay her the student loans.

11        Debtor argues that her participation in the Federal Employees Retirement System is not

12   voluntary but concedes that she makes voluntary contributions under the Thrift Savings Plan

13   ("TSP"), in addition to the involuntary contributions, in the amount of 10% of her pay. See

14   Debtor's Verified Opposition at § VII, B, 1, i-ii. She argues that her 10% voluntary contribution

15   under the TSP is insufficient to fund her retirement according to "current industry" and

16   anticipates contributing more as her salary increases in the future. Id. at § VII, B, 1, ii. Debtor,

17   who is 36 years old, alleges that she will not be able to pay off her current student loan debt

18   within her remaining working career of approximately 30 years. Id. at § VII, A, 3. Other than

19   her vague reference to "current industry", however, Debtor has provided no admissible evidence

20   supporting her argument that a 10% contribution is insufficient for retirement.

21        As previously noted, Defendants' argument that the Debtor is not entitled to *any*

22   voluntary contribution for retirement is not supported by the authorities cited. Defendants have

---

24   [25] At the hearing, counsel for ECMC argued that elimination of Debtor's voluntary
25   contributions of $202.80 per pay period would result in an after tax increase of $236.64 in her
     monthly take home pay, while leaving intact the employer's contributions. Of course, if the
26   Debtor ceases making a voluntary TSP contribution, her employer's matching contribution of
     $81.12 per pay period arguably would be eliminated.

27   [26] Debtor states that the $37.99 deduction from her paycheck is for her health benefits,
28   presumably for her insurance premiums, automatically deducted each pay period by her
     employer. See Debtor's Verified Opposition at § VII, B, 1, iii.

15

1   provided no evidence that the Debtor's retirement contributions exceed the amount necessary to

2   provide for her future retirement needs.   Likewise, Debtor has failed to provide admissible

3   evidence demonstrating what an appropriate amount would be.  Under these circumstances,

4   factual disputes exist as to the amount of voluntary retirement contribution that should be

5   permitted.

6        The foregoing discussion addresses some but not all of the monthly expenses that are

7   disputed by the parties.[27]  It is unnecessary for the Court to review each additional monthly

8   expense, however, since the Debtor has presented sufficient evidence demonstrating that genuine

9   issues of material fact exist as to the first prong of the Brunner test.

10       **B.**    **Additional Circumstances Indicating that Debtor's Situation is Likely to**

11           **Persist.**

12        As to the second prong of the Brunner test, THECB argues that the Debtor has no

13   insurmountable barriers to overcome and has promising prospects for her future employment.

14   This prong requires a debtor to show that additional circumstances exist so that the debtor's

15   current state of affairs is likely to persist for a significant portion of the repayment period of the

16   student loans.  According to the <u>Brunner</u> court, in addition to a current inability to repay, the

17   debtor must show "exceptional" circumstances "strongly suggestive of continuing inability to

18   repay over an extended period of time."  831 F.2d at 396.

19        In adopting the Brunner test, courts in this circuit have clarified that a debtor's

20   circumstances "need be exceptional only in the sense that they demonstrate insurmountable

21   barriers to the debtor's financial recovery and ability to currently repay the student loan now and

22   for a substantial portion of the loan's repayment period."  <u>In re Carnduff</u>, <u>supra</u>, 367 B.R. at 128,

23   <u>citing</u> <u>In re Nys</u>, 446 F.3d 938, 941 (9th Cir. 2006).  Thus, in applying these standards, the second

24   prong of the Brunner test sets a high, but not impossible, bar.  367 B.R. at 129.  As the appellate

25   panel in <u>Carnduff</u> observed, "To discharge any of their student loan debt to the Government,

26   Debtors must prove by a preponderance of the evidence that, for a substantial portion of the loan

27

28        [27]  The other disputed expenses include Debtor's monthly expenditures for professional
fees, medicine, car payments to her father, dental work for her daughter, and electricity.

1   repayment period, they would not be able to maintain even a "minimal" standard of living if

2   forced to pay that debt." Id.

3       It is well-established that a "partial discharge" of a student loan debt also is permissible.

4   See In re Saxman, supra, 325 F.3d at 1175. When a partial discharge is sought by either the

5   lender or the debtor, the debtor typically presents evidence of current income and expenses and

6   any other relevant facts under Brunner, and the lender presents contrary evidence. See In re

7   Carnduff, supra, 367 B.R. at 128. The bankruptcy court must then determine, based upon the

8   evidence presented, whether the debtor can afford to pay all, part, or none of the student loan

9   debt without undue hardship. Id.[28]

10      THECB argues that the Debtor is currently "underemployed" and that her future

11  employment prospects are promising. It argues that, based upon the Debtor's resume, she is not

12  utilizing her accounting, finance, language, or legal skills and experience in her present position

13  with the Bureau of Land Management. See MSJ-2 at 18:5-24. Based upon Debtor's responses

14  to interrogatories and other documentation, THECB further argues that the Debtor has received a

15  promotion at her current employment and is eligible as soon as November 2007 for the next

16  higher federal pay grade (GS-12) having a salary at $63,417.00, pursuant to the 2007 published

17  salary for federal employees. Id. at 18:26 to 19:4 and Exhibits "B", "F", "J" and "S" thereto.

18      Debtor argues that THECB has misinterpreted her interrogatory response. See Debtor's

19  Verified Opposition at § VIII, D. After reviewing Debtor's actual response to the pertinent

20  interrogatory (No. 30), see Exhibit "J" to MSJ-2, the Court agrees. Debtor argues that although

21  she might be eligible for a job at a GS-12 grade in November 2007, first there must be a vacancy

22  available. She indicates that she would have to compete for this position, would have to be

23  qualified, and would have to be picked from the pool of qualified applicants. In other words, a

24

25      [28] "We publish to emphasize that the bankruptcy court has the power to grant a partial

26  discharge of student loans even when the debtor's earning capacity is expected to improve, if

27  that improvement will be insufficient for the debtor to pay the full balance due without an undue

28  hardship. However, in that event, the burden of proof remains with the debtor to establish undue

    hardship as to any portion of the debt to be discharged." Carnduff, supra, 367 B.R. at 123.

1  job change to a higher pay grade is not automatic nor guaranteed. Debtor does, however,

2  concede that she may be eligible for in-grade step increases during the next 8-10 years. See

3  Debtor's Verified Opposition at § VIII, D, E and F.

4  As previously noted, the amount allegedly owed to THECB is approximately $16,655.09

5  as of June 5, 2007. If the Debtor had returned to repayment status effective August 1, 2007,

6  THECB argues that the Debtor's monthly payments would be $257.00. See MSJ-2 at 4:7-8 and

7  Exhibit "U." THECB offers other payment options and has apparently offered two plans to the

8  Debtor to consider: the Graduated Repayment Plan or the Income Sensitive Plan. Id. at 4:9-15

9  and Exhibit "U". Under the Graduated Repayment Plan, THECB argues that Debtor's monthly

10  payment would be $150.00 per month for the first year and would thereafter increase $50.00 a

11  month per year. Id. THECB also estimates that the Debtor's payment under an Income

12  Sensitive Plan ("ISP"), based on her gross income, would be approximately $203.00 per month.

13  Id. However, an ISP is granted in 12-month increments and the Debtor's previous ISP expired

14  on May 11, 2007. Id. at n.1.[29]

15  Also as previously noted, ECMC asserts that the Debtor owes $128,810.47 as of June 11,

16  2007. ECMC argues that there are four types of repayment plans available under the William D.

17  Ford Program through the Department of Education. See ECMC Joinder at 2:7-10 and Exhibit

18  "A" thereto. It argues that the Debtor "would be eligible for the Income Contingent Repayment

19  Plan option for which the monthly payment is $479.50." Id. However, Note 2 to ECMC's

20  Exhibit "A" states that "This is an estimated repayment amount for the first year and total loan

21  payment, based on the information you provided. This repayment amount will be recalculated

22  annually and is subject to change based on the poverty guidelines for your family size as

23  determined by the U.S. Dept. of Health & Human Services. This plan has a maximum term of

24  25 years." Thus, the $479.50 monthly payment amount for which the Debtor arguably qualifies

25

26

27  [29] Additionally, THECB clarified that "Borrowers are eligible for up to 60 months in

28  Income Sensitive Plans, in 12 month increments. To date, Debtor has used 13 of her 60 months." Id. at n.2.

18

1  may change and increase.[30]

2         Debtor argues that she will not have adequate income to make approximately $2,000.00

3  in combined monthly payments over the next 30 years to extinguish her student loans during her

4  working career.  See Debtor's Verified Opposition at § VIII, Summary and Exhibit "R" thereto.

5  Debtor does not clearly explain how she arrived at the $2,000 figure, but it appears to be based

6  on her calculation of the principal amounts owed on both loans and accruing interest, her

7  estimate of $176,000 in attorney's fees that will be sought by THECB, and her estimate of the

8  monthly payment increases required by the available loan repayment programs.  Id. at § VII, A,

9  3 and Exhibit "F" thereto.   However, inasmuch as the $479.50 monthly amount under the

10  Income Contingent Repayment Plan option may not be the actual amount owing to ECMC

11  according to its Exhibit "A," and because the monthly amounts owing to THECB would vary, it

12  is unclear what monthly amounts would be owed under the repayment plans offered by the

13  Defendants.

14         ECMC contends that the Debtor has excess income each month in the amount of $704.14

15  and $1,124.14 sufficient to make payments on her loans.  See ECMC Joinder at 2:11-13.

16  Because there are several factual disputes with respect to the Debtor's monthly expenses and

17  income, the figures offered by ECMC may not be accurate.  If the monthly payments owed to

18  THECB and ECMC are approximately $2,000.00 per month as suggested by the Debtor, neither

19  THECB nor ECMC have demonstrated that the Debtor would be able to maintain a minimal

20  standard of living over the life of the repayment period.  See In re Carnduff, supra, 367 B.R. at

21  128-129.  Debtor also argues, however, that even if she were to temporarily lower her payments

22  under the repayment plans offered by the Defendants, any future increases in her income will not

23  be sufficient to cover the incremental increases in payments required by each of the repayment

24  plan options.  Given the uncertainty as to Debtor's eligibility for higher paying positions at her

25  current employment, Debtor's argument is persuasive based on the current evidentiary record.

26  ───────────────

27         [30]  Although not identical, the Income Contingent Repayment Plan under the William D.
    Ford Program appears to be functionally equivalent to the Income Sensitive Plan available from
28  the THECB.  See THECB's Response to Debtor's Interrogatory No. 11 attached as Exhibit "F"
    to Debtor's Verified Opposition.

The Court concludes that there are sufficient material facts in dispute regarding the second prong of the Brunner test.  Summary judgment is inappropriate as to this element.

### C.    Debtor's Good Faith Efforts to Repay.

The third prong of the Brunner test requires a showing that the Debtor has made a good-faith effort to repay her student loans.  Good faith is measured by the debtor's efforts to maximize income, minimize expenses, and seek alternate repayment plans.  See In re Mason, 464 F.3d 878, 884 (9th Cir. 2006).

Defendants argue that the Debtor has not acted in good faith.  In addition to its previous argument that the Debtor is underemployed and that her expenses are excessive, see MSJ-2 at 21:19-20, THECB specifically argues that the Debtor has additional assets that should be considered in determining whether to permit a hardship discharge of her student loans.  For example, THECB argues that  the 2006 tax return for the Debtor's wholly-owned former law practice, "Stephanie Porter, P.C.," discloses the existence of various law books having a depreciated basis of $3,800.00.  See MSJ-2 at 20:11-16 and Exhibit "T".  THECB asserts that the law books have value, were not sold by the bankruptcy trustee, and could be liquidated to make payment on the Debtor's student loans.  Id. at 20:17-20.

Additionally, THECB argues that the Debtor has not been "forthcoming about her relationship to several entities and whether she has received and/or continues to receive income from those businesses."  Id. at 20:21-23.  THECB alleges that the Debtor's father, Steven M. Porter, continued to represent clients of her former law practice in Texas after the Debtor moved to Nevada.  Id. at 20:22 to 21:5.  THECB represents that the Debtor's father testified to having no recollection of any compensation received for the work he did for Stephanie Porter, P.C.  Id. at 21:5-8 and Exhibit "D".[31]   It argues that someone would have been compensated for the legal services performed by Stephanie Porter, P.C. after the Debtor moved to Nevada, of course implying that the Debtor received the income.  Id.

Debtor argues that she fully disclosed her relationship to her former law practice to the

---

[31]  Exhibit "D" is a copy of a transcript of the deposition taken of Steven Porter on May 18, 2007.  THECB references page 52, lines 16-19 of the transcript.

1    assigned Chapter 7 trustee and participated in a meeting of creditors wherein she provided

2    information regarding her former employment.  See Debtor's Verified Opposition at Second §

3    VIII, B.[32]  She also argues that the law books are now five years old and that their liquidation

4    value would be nominal.  Id.  Additionally, the books are located in Texas and the Chapter 7

5    trustee did not attempt to liquidate them.  Id.

6         Debtor also asserts that she transferred all unearned legal fees in her law firm trust

7    account to Steven Porter's trust account.  Id. at Second § VIII, C.  Debtor argues that any monies

8    transferred to Steven Porter's trust account that were unearned or not paid to either Steven Porter

9    or Shawn Sheffield must remain in the trust account and that any interest on said account would

10   continue to accrue to the State Bar of Texas.  Id.   In essence, Debtor argues that the funds in the

11   trust account belong to the former clients of her old firm and not to her.

12        THECB also contends that Porter and Geist, L.P. lists the Debtor as an employee on the

13   "porterandgeist.com" website, and that the Debtor uses an electronic mail address with the

14   "porterandgeist" domain name.  See MSJ-2 at 21:9-17.[33]  THECB argues that the 2006 tax return

15   for "Stephanie Porter, P.C." was prepared by "Porter and Geist, L.P."  See Exhibit "T" to MSJ-2.

16    Additionally, THECB contends that  the Debtor's father testified that, although Porter and Geist

17   is shown as the preparer for the Debtor's 2006 tax return, the Debtor actually prepared the return

18   herself using Porter and Geist's software.  See MSJ-2 at 21:15-17 and Exhibit "D".[34]

19        Debtor asserts that she personally prepared the 2006 tax return for Stephanie Porter, P.C.,

20   but that no income was given to Porter & Geist, L.P. for the use of its software.  Moreover,

21   Debtor asserts that she did not personally receive any income or recognize a business expense

22

23        [32]  Because Debtor's Verified Opposition lacks page or line numbers, and her outline
     includes two portions marked "VIII", the last portion will be cited as "Second §" in this

24   Memorandum Decision.

25        [33]  According to the deposition transcript of Steven Porter, Porter and Geist, L.P. is an
     accounting firm that can be reached through the polterandgeist.com website.  The same website

26   apparently allows for access to legal services.  See Exhibit "D" to MSJ-2 at page 21, line 12

27   through page 22, line 10.

28        [34]  THECB refers to the deposition transcript of Steven Porter at page 23, lines 1-24 and
     page 24, lines 1-22..

1   for the preparation of the return.  See Debtor's Verified Opposition at Second § VIII, D.  While

2   she acknowledges that she does use the e-mail address Steph@porterandgeist.com, as well as

3   skporter02@yahoo.com, and Stephanie_Porter@blm.gov, see id. at Second § VIII, E, she does

4   not clarify why she is using the Porter & Geist e-mail address if she is not an employee.  Debtor

5   argues that if she was not reporting income received from such sources, she would be

6   committing  tax evasion, and that THECB's argument therefore  is "baseless and frivolous."  Id.

7   Such arguments, of course, simply go to credibility and do not answer the question of whether

8   she receives other income as an employee of Porter & Geist.  This is a factual issue that can be

9   resolved at trial.

10       THECB does not appear to dispute that the Debtor has sought alternative repayment

11   plans under the third part of the Brunner test.  As noted, in connection with the second prong,

12   THECB argues that the Debtor currently is underemployed.  See MSJ-2 at 18:5-24.  However,

13   THECB also states that the Debtor's future employment prospects at her current employment are

14   promising and that the Debtor has provided evidence in her interrogatory responses that she has

15   been seeking alternate employment since the filing of her bankruptcy case.  Id. at 18:26 to 19:18

16   and Exhibit "B" thereto.[35]   On its face, this seems to undercut THECB's argument on the good

17   faith issue.

18       ECMC argues that the Debtor is a lawyer licensed in the State of Texas and has chosen

19   not to pursue a career as a lawyer but as a land examiner in Nevada.  See ECMC Joinder at 5:3-

20   9.  It argues that the Debtor is capable of taking the Nevada bar exam or returning to Texas to

21   practice law, in either case earning more than her current $52,910 annual salary.  Id.  ECMC

22   therefore takes the position that the Debtor is underemployed.  Id.  ECMC also does not dispute,

23   however, that Debtor has attempted to seek an alternative repayment option for the student loans

24   she owes to ECMC.

25       Debtor argues that she is not presently underemployed.  See Debtor's Verified

26   ───────────────────

27       [35]  Although Debtor apparently indicates that she would be willing to consider
     undertaking projects for Porter & Geist clients, see Exhibit "B" to MSJ-2 at Interrogatory
28   Response 2, none of the parties have addressed whether she could take such outside professional
     employment while currently employed by the federal government.

1   Opposition at § VIII, B.  She asserts that "she is required to do extensive legal research and

2   perform the adjudication of issues brought before the Bureau of Land Management concerning

3   the sub-surface mineral estate held by the U.S. Government."  Id.  Additionally, Debtor states

4   that she "is responsible for maintaining approximately $795,000,000 in financial instruments

5   held by the Nevada State Office, which guarantee surface reclamations bonds posted by

6   domestic and international entities and individuals."  Id. and Exhibit "G" thereto.  Debtor argues

7   that she accepted employment with the Bureau "to improve her family economics, to become

8   self-sufficient, and to pay her debts."  Id. at § VIII, C.  Additionally, she contends that she is not

9   working for minimum wage and that, although her job title is not "attorney," she is working in

10  the legal field.  Id. at § VII, Summary, 2 and Exhibit "Q."  Debtor attempts to put her current

11  pay in perspective, arguing that her "current gross income is equivalent to a Lieutenant Colonel

12  in the Armed Forces," and that "she is not underemployed either in pay or in legal

13  responsibilities."  Id.

14          Debtor also argues that prior to obtaining her current position at the Bureau of Land

15  Management in Nevada, she "applied for more than 100 positions nationwide and internationally

16  over a span of 18 months."  Id. at § VII, A, 1.  She states that "after more than twelve interviews

17  she was offered two positions in November of 2005: one with the Texas Workforce Commission

18  at an annual salary of  $29,000, and one with the Bureau of Land Management at an annual

19  salary of $41,772."  Id.

20          Debtor also argues that she has demonstrated her good faith by paying in excess of

21  $27,473.45 to THECB and more than $22,534.65 to ECMC from 1998 to the present.  See

22  Debtor's Verified Opposition at Second § VIII, A.  Additionally, she states that she has made

23  voluntary payments to the attorneys for both THECB and ECMC since January 2007 totaling

24  $1,000.00.  Id.  Moreover, Debtor argues that she has attempted, on three separate occasions, to

25  set up a settlement conference between the parties to calculate  reasonable and acceptable

26  payments in an effort to extinguish her student loan debt.  Id.

27          Debtor argues that she is living a simple lifestyle without home telephone or cable

28  television and that she purchases most of her clothing and articles for her home at discount stores

such as "Wal-mart or second-hand stores." Id. at Second § VIII, Summary, 2. Debtor believes she has made a good faith effort to maximize income from employment and that she has attempted to work with THECB and ECMC in calculating affordable payments that would cancel her student loan debt "within 30 years" but to no avail or efforts from Defendants. Id.

At the hearing, Debtor also argued that when she completes any of the repayment programs offered by the Defendants she will receive an IRS Form 1099 reflecting debt forgiveness income for any unpaid amount of her student loans. As such, she argues that she will be saddled with a substantial tax liability at the end of any repayment plan. Counsel for THECB did not believe that any tax consequences would result under its ISP repayment program, apparently because it requires repayment in full and no debt forgiveness at all.[36] Counsel for ECMC represented that it is an open question whether a 1099 form would be issued upon completion of an Income Contingent Repayment Plan[37] for the simple reason that the program has not been in effect for the 25-year period for such payments, i.e., no one yet has completed payments on such a plan. More than one court has recognized the legitimacy of the Debtor's concern. See In re Carnduff, supra, 367 B.R. at 136-37.[38]

Debtor's actual efforts to maximize her income, minimize her expenses, and to seek alternative payment plans are in genuine dispute. Summary judgment on the third prong of the Brunner test also is inappropriate.

## CONCLUSION

For the reasons set forth above, genuine issues of material fact exist and summary judgment is not appropriate with respect to any of the elements required under the Brunner test.

---

[36] Counsel offered to check with the administrators of the ISP to find out if there could be possible debt forgiveness income tax liability under the THECB program.

[37] Under the Income Contingent Repayment Plan, the debtor makes payments on the student loan for a maximum of 25 years, see Exhibit "A" to ECMC Joinder, and then apparently is relieved of any unpaid balance.

[38] The Carnduff court cited several decisions raising this issue: In re Birrane, supra, 287 B.R. at 500 n.7; In re Korhonen, 296 B.R. 492, 496-97 (Bankr.D.Minn. 2003); In re Sequeira, 278 B.R. 861, 863 n.2 (Bankr.D.Or. 2001); In re Williams, 301 B.R. 62, 78-79 (Bankr.N.D.Cal. 2003).

1  Defendants' motions therefore will be denied.  A separate order has been entered concurrently
2  herewith.
3  Copies noticed through ECF to:

4      ASHLEY FLYNN BARTRAM ashley.bartram@oag.state.tx.us
5      CYNTHIA R HOOVER djyoung@ag.state.nv.us
6      ABIGAIL L. RUSHING abigail.rushing@oag.state.tx.us
7      AMY N. TIRRE amy@amytirrelaw.com

8
9      and sent to BNC to:
10             All parties on BNC mailing list
11
12                                      # # #
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28